# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 16-cr-30140-MJR |
| | ) | |
| TIMOTHY CROSS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

**REAGAN, Chief Judge:**

**A.** **Introduction**

Indicted on a charge of felon in possession of a firearm, Timothy Cross is set for trial on December 11, 2017. Specifically, the indictment alleges that on or about June 17, 2016, in St. Clair County, Illinois, Timothy Cross knowingly possessed, in or affecting commerce, a Smith & Wesson .357 caliber revolver, in violation of 18 U.S.C. 922(g)(1). Cross initially appeared before Magistrate Judge Wilkerson, entered a not-guilty plea, was found financially unable to retain counsel, had the Federal Public Defender's Office appointed to represent him, and was given a trial date. Cross successfully moved to continue the trial several times and, more than six months after the February 2, 2017 motion deadline elapsed, sought leave to file a belated suppression motion. Finding good cause, the undersigned allowed the late suppression motion and continued trial to the current setting.

On November 15, 2017, the Court held an evidentiary hearing, received evidence, heard witness testimony, and took the motion under submission. For the reasons stated below, the Court denies the suppression motion.

### B. Summary of Key Evidence and Arguments

Around 10:25 p.m. on June 16, 2016, an off-duty part-time Washington Park Illinois police officer, Lawrence Keel, was working as a private security guard at the Crown Food Mart at 8301 State Street in East St. Louis, Illinois.[1] Three women told Keel (who was inside the store) that there was a fight going on in the store parking lot.[2] Keel exited the store and saw two men shoving or pushing each other. One of the men was Timothy Cross. Keel recognized Cross, as the two had attended elementary school together. Keel had also seen Cross, over the recent few years, frequenting the Crown Food Mart. Keel separated the two men and ordered them to leave the property.

Both men went to vehicles. Cross did not immediately leave. He yelled several times to the other man, who had gotten into his own vehicle. Cross got into his car (in which a lady was seated), drove to a gas pump, got *out* of the car, and continued yelling at the other man. Keel approached Cross and again ordered him to leave.

---

[1] At that point, Keel had held this security job for about four years and was working 9:00 p.m. to 2:00 a.m. a couple nights a week. He described his shift as the hours when "bad things" often happened there. Keel now is a patrolman/public safety officer with the East St. Louis Housing Authority.

[2] The Crown Food Mart is a convenience store with gas pumps. This is the same property referred to by Cross as the "Mobil station" and shown in Defendant's exhibits with a sign that reads "Gas-Mart."

Keel suggested that the lady in the car get in the driver's seat and "get him away from up here."  Cross got into the passenger side of the car and, as they pulled from the lot, Cross shouted out the passenger window:  "When I see you, it's like that."  Keel heard and interpreted this as a threat of harm by Cross – either directed at Officer Keel or, more likely he thought, aimed at the man with whom Cross was involved in the fight.

Ninety minutes later, just after midnight on June 17, 2016, Keel was inside the Crown Food Mart still working his security shift, when a black male (unknown to Keel) came in the store and reported that a guy was in the parking lot with a gun.  At this time, Keel was standing near or slightly beyond the cash register area of the store, which was approximately 15 to 20 feet from the glass double doors at the front of the store.[3]  Keel walked to the doorway and testified that from in (or just outside) the doorway he saw Cross in the lot with a silver firearm in his hand, which Cross quickly tucked into his trousers.  Specifically, Keel testified that when Cross made eye contact with Keel, Cross tucked the gun inside the right waistband of his pants.

---

[3]     Keel testified on direct examination that the distance from where he was standing to the front door was the distance from the witness stand to prosecution counsel table in the undersigned's courtroom – the latter is about 15 feet.  Keel testified on cross-examination that the distance might be 20 feet (maybe even 30 feet "from the back of the store to the front").  This distance can also be assessed by viewing Defendant's Exhibit E-6 and factoring in Keel's testimony regarding his position in relation to the store cashier.  It bears note that the refrigerated coolers and display partially blocking the windows near the entrance in Exh. E-6 were not present on the date in question.  Keel did not recall whether one of the double glass doors was open at the relevant time.  This incident occurred in June. Keel testified that at that time, often one of the doors was propped open.

Keel, who testified that he (a) knew Cross was a convicted felon and (b) perceived potential for injury to himself or the public, briefly surveyed the situation from the doorway, noticing other persons in the lot. Keel then moved from the store to the parking lot. As he was walking toward Cross, Keel told Cross to show his hands. Cross quickly complied but kept walking *away* from Keel and went around the back of a white Lincoln or Grand Marquis. Keel drew his weapon, followed Cross around the car, ordered Cross to the ground, closed the distance between himself and the then-prone Cross, and handcuffed him. Keel immediately reached into the right-side waistband of Cross' pants and removed a chrome Smith and Wesson .357 caliber revolver (which, according the Government, Doc. 44, p. 3) contained six live bullets. Cross was taken inside the store, and Keel contacted the East St. Louis Police. Officer Andre Henson of the East St. Louis Police arrived and took custody of Cross, who was arrested for unlawful use of weapon. *See* Defendant's Exhibit ("Def Exh.") A.

East St. Louis Detective Sergeant Jerry Simon, who was part of the U.S. Marshals Fugitive Task Force but also assisted East St. Louis police detectives in interviewing suspects,[4] interviewed Cross at 9:30 a.m. that morning (June 17, 2016). At the time of the interview, Simon had not spoken to Keel, had not reviewed Keel's report, and had not seen any video footage from the incident. Simon fully Mirandized Cross.

---

[4]     Simon now is Chief of the East St. Louis Police Department and a 23.5-year veteran of the force. At the time in question, he was a Detective Sergeant (a position he had held for 12 years).

The Miranda form was admitted in evidence (Government's Exh. 3). The entirety of the interview was videotaped, and the tape was admitted (Government's Exh. 4).

During the interview, Cross repeatedly and freely stated that he had a gun on the date in question. He also noted that he was "drunk," "intoxicated," and "mad." Cross explained that earlier in the day (June 16, 2016), he had been in his car with a guy named Jeremy, that subsequently Cross' girlfriend, Stephanie Taylor, got in Cross' car and discovered a gun—a gun belonging to Jeremy that Jeremy had left in Cross' car, unbeknownst to Cross. According to Cross, the 10:30 p.m. tussle at the Crown Food Mart lot was an argument about the gun, which Jeremy accused Cross of stealing.

Cross told Detective Simon that, during this 10:30 p.m. encounter, Jeremy retrieved a weapon from his trunk, pushed Cross, and struck Cross in the neck. Cross offered to show Detective Simon a bruise he felt developing where he was hit by Jeremy. Cross said the security guard (Lawrence Keel, whom Cross refers to as "Officer Lawrence") came out of the Food Mart and told Cross to leave the property. This upset Cross, because (by his account) Jeremy had pulled a gun on him, struck him, shoved him, and was allowed to leave, and Keel – who should be protecting Cross – did nothing to Jeremy while harshly hustling Cross off the premises.

Cross admitted that he returned to the store ninety minutes later, with the gun in his car. Reluctant to confront the irate Jeremy but not wanting to take the gun to his own home in Belleville, Cross was going to take the gun to his mother's house, just two

blocks from the Food Mart. Then Cross happened to see Jeremy's uncle in a car at or near the Food Mart, and he decided to return Jeremy's gun to the uncle. So Cross flagged down the uncle for this purpose. Cross freely acknowledged that he parked his car at the Food Mart, grabbed the revolver from "out of the back seat," stepped out of the car holding the gun, and as he walked away from his car toward the front of the store, tucked the gun into his right waistband. A man walked up to Cross, but Cross did not want to take time to talk to him. Cross repeated that at this point he was mad because Keel had let a Jeremy pull a gun on him, that this was all surely captured "on camera," and that Jeremy faced no consequences from this attack. Crown insisted that if Detective Simon would review the videotapes, they would back up his account of the initial altercation he had with Jeremy in the Food Mart parking lot.

Three days later, on June 20, 2017, Detective Simon went to the Crown Food Mart and requested any video surveillance from June 16-17, 2017. He was told by the store manager that he could view the video, but (due to the system being replaced and the fact they were "waiting on IT" to install a new system) they were unable to make copies of the footage or transfer it to a thumb drive. Detective Simon and the manager viewed the video on the store's monitor. Simon searched for the date and times in question. Using his cell phone camera pointed at the monitor, Simon recorded two excerpts he thought were relevant. *See* East St. Louis Police Department Report by Jerry C. Simon, Doc. 36-2, p. 1. Via this method, Detective Simon preserved two portions of the video

surveillance footage -- Exhibits B & C to Doc. 36, admitted at the hearing as Government's Exhibits 1 and 2.

The first clip is ten seconds long, running from 00:16:27 a.m. to 00:16:37 a.m. The second clip, shot from a different camera, runs from 00:17:49 a.m. to 00:18:39 a.m. No video was presented of the one-minute-and-twelve-second gap between these two videos. Simon testified that he viewed the video of the one-minute-twelve-second period, and it depicted Cross walking casually toward a car in the parking lot and talking to a couple of people on the lot. He did not deem it of evidentiary significance.

The first video plainly shows Timothy Cross walking away from his vehicle, one of three cars parked at the front of the Crown Food Mart, near the store entrance. As he walks from his car, Cross is approached by an individual who talks to Cross momentarily, and Cross can be seen tucking an object of some kind (it is not clear that it is a gun) into the waistband of his pants on the front right side. The second video shows Keel striding across the parking lot toward Cross. Cross does not stop while being advanced on by Keel. He continues to walk away from Keel, raising his arms and circling around the back of a white vehicle (which appears to be the Lincoln or Grand Marquis previously parked by the store entrance). Keel can be seen, as he comes around the Lincoln pursuing Cross, to raise his weapon – after which Cross lies down on the ground, on his stomach. Testimony established that Keel ordered Cross to get on the ground, and Cross complied without resistance. After cuffing Cross, Keel reached

directly for Cross' front right waistband and retrieved a silver revolver. This, Keel maintains, is the weapon he saw Cross holding and tucking into his pants, after a customer reported a man in the lot with a gun.

Squarely challenging Keel's account that Keel saw Cross with a gun in his hands, Defendant argues that there was no warrant to arrest Cross and no probable cause to arrest Cross, so all evidence acquired from the arrest and subsequent search (both the .357 and the testimonial evidence) is "fruit of the poisonous tree" which must be suppressed. In its written submission, the United States ("the Government") responded on three fronts.

First, the Government asserted that Lawrence Keel was not acting as a police officer. He was acting as a private individual, whose conduct the Fourth Amendment does not govern. Second, the Government asserted that if Keel was functioning as an instrument of the government, he had probable cause to arrest Cross, and the lawful arrest supports a warrantless search incident to arrest. Third, the Government asserted that if Keel was an agent of the government and lacked probable cause to arrest Cross, Keel's conduct was a permissible *Terry* stop and protective frisk.

### C.   <u>Analysis</u>

The Fourth Amendment to the United States Constitution protects the right of the people to be secure in their persons against unreasonable searches and seizures. *Ziglar v. Abbasi*, -- U.S. --, 137 S.Ct. 1843, 1866 (2017); *Manuel v. City of Joliet, Ill.*, --

**U.S. --, 137 S.Ct. 911, 917 (2017).**  But the prohibition against unreasonable searches and seizures does not apply to the actions of *private* citizens; it extends only to the conduct of government agents and instruments.

> It is axiomatic that the Fourth Amendment does not apply to private entities.  Like much of the Constitution, "it was intended as a restraint upon the activities of sovereign authority." *Burdeau v. McDowell,* 256 U.S. 465, 475 … (1921). The Supreme Court has held that a wrongful search or seizure conducted by a private party does not rise to a constitutional violation of the Fourth Amendment …  nor prevent the government from using evidence that it has acquired lawfully. *Coolidge v. New Hampshire,* 403 U.S. 443, 487-90 … (1971).

*United States v. Koenig,* **856 F.2d 843, 846-47 (7th Cir. 1988).**

In determining whether a private person acted as an instrument or agent of the government so as to trigger Fourth Amendment protections, the district court's analysis "must be made on a case-by-case basis and in light of all the circumstances" surrounding the search or seizure.  ***Id.  See also United States v. Hall,* 142 F.3d 988, 993 (7th Cir. 1998) (Fourth Amendment is completely inapplicable to a search or seizure, even an *unreasonable* one, undertaken by a private individual not acting as an agent of the government).**  In deciding if a person is an agent of the government, the court examines (1) whether the government know of *and* acquiesced in the intrusive conduct, (2)whether the private party's central purpose for conducting the seizure or search was to assist law enforcement or to further his own ends, and (3) whether the government offered the private party a reward.  ***Hall,* 142 F.3d at 993.**

In *United States v. Shahid,* **117 F.3d 322, 326 (7th Cir.)**, *cert. denied,* **522 U.S. 902 (1997),** a mall security guard was found to be acting as a private individual when he searched a suspect for stolen items and held him in custody until the police arrived. In *United States v. Ginglen,* **467 F.3d 1071, 1074 (7th Cir. 2006)**, a defendant's two sons (one of whom was an off-duty policeman) were found to be acting as private individuals when they searched their dad's house. In both cases, the Seventh Circuit asked whether the government knew of and acquiesced in the intrusive conduct and what the private party's main purpose was.

In *Shahid,* the Seventh Circuit found that the security guard was primarily motivated by a desire to fulfill his duty to provide safety for persons on mall property, rather than to assist law enforcement. Although he planned to turn the suspect over to law enforcement, the guard's separate objective (to secure the mall's patrons and employees) sufficed to demonstrate that he acted as a private person. Indeed, even if the guard acted *solely* to assist law enforcement, he would not be a government agent unless the government knew of or acquiesced in his actions, said the Court.[5]

---

[5]     "[E]ven if the sole or paramount intent of the security officers had been 'to assist law enforcement' … [that] intent would not transform a private action into a public action without the government's knowledge of the action (or of the policy or practice of performing such actions), combined with 'some exercise of governmental power over the private entity,' *i.e.,* 'some manifestation of consent and the ability to control.'" *Shahid,* **117 F.3d at 326,** *quoting Koenig,* **856 F.2d at 849-50.**

In *Ginglen*, the Seventh Circuit pointed out that the sons' main objective in going into the house was to protect the community from their father's destructive behavior, not to assist law enforcement. The sons did not notify the police department *prior* to the search and did not ask for any reward. There was no indication the police department encouraged the sons' actions. The conclusion that the sons acted as private citizens was reached despite the fact one of the brothers, an off-duty police officer, wore his police badge and gun to the home. The Court noted: "like the security guard in *Shahid*, … [the brothers'] primary objective was to protect the community from harm, not to assist law enforcement." *Ginglen,* **467 F.3d at 1075.** Suppression was properly denied.

Here, Defendant Cross bore the burden of proving that Lawrence Keel was acting as a government agent at the time of the seizure and search. ***United States v. Aldridge,* 642 F.3d 537, 541 (7th Cir. 2011).** ***See also Ginglen,* 467 F.3d at 1074; *Koenig,* 856 F.2d at 847.** This Court need not decide whether defense counsel satisfied that burden, because at the November 15th hearing, the prosecution conceded that Lawrence Keel was acting as an agent of the government when he stopped and searched Timothy Cross. So, assuming that Keel was acting as an agent of the government such that Fourth Amendment protections apply, the Court considers whether his actions pass constitutional muster.

"The Fourth Amendment protects citizens against unreasonable searches and seizures." ***United States v. Richards*, 719 F.3d 746, 754 (7th Cir. 2013).** "Subject to

limited exceptions, 'warrants are the general rule' in judging the reasonableness of a search or seizure." *United States v. Paxton,* **848 F.3d 803, 807 (7th Cir. 2017),** *quoting Katz v. United States,* **389 U.S. 347, 362 (1967)(Harlan, J., concurring).** Therefore, a "warrantless search is per se unreasonable under the Fourth Amendment subject to a few well-established exceptions." *United States v. Zahursky,* **580 F.3d 515, 521 (7th Cir. 2009),** *citing Arizona v. Gant,* **556 U.S. 332, 338 (2009).** If law enforcement conducts a warrantless search, the government must demonstrate by a preponderance of the evidence that the search fell within one of the exceptions. *Zahursky,* **580 F.3d at 521,** *citing U.S. v. Basinski,* **226 F.3d 829, 833 (7th Cir. 2000).**

One exception is search incident to a lawful arrest. *See, e.g., United States v. Harris,* **791 F.3d 772, 777 (7th Cir. 2015).** A warrantless arrest is lawful if supported by probable cause. *United States v. Paige,* **870 F.3d 693, 699 (7th Cir. 2017),** *citing United States v. Sands,* **815 F.3d 1057, 1061-62 (7th Cir. 2015).** An officer may make a warrantless arrest consistent with the Fourth Amendment if there is probable cause to believe that a crime has been or is being committed. *United States v. Daniels,* **803 F.3d 335, 354 (7th Cir. 2015),** *cert. denied sub nom. Dean v. United States,* **-- U.S. --, 136 S.Ct. 2410 (2016),** *quoting Washington v. Haupert,* **481 F.3d 543, 547 (7th Cir. 2007).**

An officer has probable cause to arrest "when the facts and circumstances within his knowledge and of which he has reasonably trustworthy information are sufficient to warrant a prudent person in believing" that the suspect has committed an

offense.  *Daniels,* **803 F.3d at 354,** *quoting Reher v. Vivo,* **656 F.3d 772, 776 (7th Cir. 2011).**  In making this determination, courts "look to a totality of the circumstances" and ask what a reasonable officer would believe. *Id., citing Jones v. City of Elkhart, Ind.,* **737 F.3d 1107, 1114 (7th Cir. 2013).**  As the Seventh Circuit recently reiterated, probable cause to arrest exists if the facts and circumstances within the officer's knowledge would warrant a "person of reasonable caution" to believe that the suspect has committed, is committing, or is about to commit an offense.  *Paige,* **870 F.3d at 699-700,** *quoting Michigan v. DeFillippo,* **443 U.S. 31, 37 (1979).**[6]

Probable cause "does not require legal certainty" or "demand that all the facts in the officer's possession point in only one direction." *Zappa v. Gonzalez,* **819 F.3d 1002, 1005 (7th Cir. 2016).  Accord Fox v. Hayes,** **600 F.3d 819, 833 (7th Cir. 2010) ("It does not take much to establish probable cause…."  Officers must have more than a bare suspicion but "need not have enough evidence to support a conviction or even to show that their belief is more likely true than false.").**  Additionally, it does not matter if the offense for which probable cause exists is not closely related to the offense identified by the officer at the time of the arrest.  *White v. Hefel,* **-- F.3d --, 2017 WL 5150832, at *4 (7th Cir. Nov. 7, 2017),** *citing Devenpeck v. Alford,* **543 U.S. 146 (2004).**

---

[6]    *Accord United States v. Slone*, **636 F.3d 845, 849 (7th Cir. 2011) (Probable cause "means that there are facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.").**

Gauging the evidence "from the vantage point of a reasonable officer facing the same situation," *Ewell v. Toney*, **853 F.3d 911, 919 (7th Cir. 2017),** the undersigned finds that, at the time of the arrest, Officer Keel had probable cause to believe Timothy Cross had committed or was committing an offense involving the unlawful use of a weapon.[7]

Without question, Cross was involved in a physical altercation with another man on the parking lot of the store around 10:30 p.m. Cross was intoxicated and agitated. Keel told Cross to leave, and he did not immediately do so. Cross drove a short distance, parked, got *out* of his car, and again started yelling toward the other man. When he did leave, after being told to do so a second time, a visibly angry Cross shouted a phrase which a prudent person would reasonably believe to be a threat of harm for the next time the two men crossed paths. Just ninety minutes later, while Keel was inside the Food Mart, a black male reported that a guy in the parking lot had a gun. Keel walked toward the door and saw Cross, who had come back to the premises.

Keel testified (and his report states) that he saw Cross holding a silver handgun and tucking the weapon into his right waistband. The Court finds this testimony credible. Keel was forthright on the witness stand, did not hesitate to admit when he could *not* remember certain details (e.g., was the door of the Food Mart open or not?

---

[7]     Keel's report (Def's Exh. A) mentions the incident as "aggravated unlawful use of weapon" and says Cross was arrested for "UUW by a felon." At the time of this arrest, 720 ILCS 5/24-1.6 defined the offense of aggravated unlawful use of weapon. This case initially was pursued by local authorities in St. Clair County (Illinois) before being turned over to the United States Attorney's Office for prosecution as a federal crime.

was Keel standing inside or just outside the entryway?), and convincingly testified that he observed the gun in Cross' hand right before Cross tucked it into his waistband.

Defense counsel persuasively argued that there was not enough time for Keel (after receiving a report of a guy outside with a gun) to cover the distance from his position in the store to the front door and look outside before the weapon was tucked in Cross' waistband.  In other words, defense counsel maintains that the weapon was only *in Cross' hand for a few seconds before it was tucked away*, so by the time Keel got to the front door, the weapon was out of sight, rendering it impossible for Keel to observe the gun in Cross' hand.

This argument has first-blush appeal but does not withstand closer scrutiny.  The relevant videotape excerpt shows Cross walking away from his car[8] at approximately 00:16:27 (minutes and seconds after midnight) and – as he walks past an empty parking spot directly in front of the store entrance – tucking an object into his right front waistband at 00:16:31 or 00:16:32.  On cross examination, Detective Simon testified that this video suggested that Cross *arrived* around 12:17 a.m. (16 minutes and 27 seconds after midnight) and had the gun out in his hands for only about four seconds before tucking it in his pants.

---

[8]    On careful inspection, the video does not show Cross actually *exiting* his car.  As the tape starts, Cross is walking away from his car door, *presumably* having just exited the car, but the tape does not clearly show him get up from or out of the vehicle.

However, the fact Cross walked away from his car at 00:16:27 does not necessarily mean that is the exact moment he arrived at the property. The video clip does not show Cross driving on to the property or parking his car. We do not know if he had pulled up moments earlier, to a gas pump or other spot, gotten out of the car (perhaps while "flagging down" Jeremy's uncle) and *then* (consistent with Simon's testimony) parked at the spot where he appears on the video walking away from the car at 00:16:27. Defense counsel presumes that the four-second window from 00:16:27 to 00:16:31 is the only period when the unknown black male (UBM) could have seen the gun and alerted management (and the same short time period in which Keel moved to the entryway and looked out to see the gun in Cross' hands). The evidence does not establish or require that to be true. It is entirely possible that the UBM saw the gun at another point or moment *before* Cross walked from his parked car past the front entrance of the store holding an object that he then tucks away.

Keel prepared his report three days before the video was retrieved, so he had not seen the video, and the video is quite consistent with the events Keel described in the sequence he describes them occurring – Cross walks from a parked car holding a silver weapon which he swiftly tucks into his right front waistband. From the place Keel said he was standing when he observed this – just inside or just outside the entryway to the Food Mart, looking straight across an empty parking space to where Cross was when he tucked the gun – Keel had a clear and unobstructed view of Cross.

Furthermore, having carefully observed Keel on the witness stand during direct and cross examination, the Court finds Keel's testimony entirely credible. There is no sound basis to conclude Keel is lying as to having seen Cross with a gun. This conclusion is bolstered by the fact that in all the dozens, perhaps hundreds, of times Keel saw Cross at the Food Mart during his overnight shift for roughly four years, many of which involved Cross being intoxicated, Keel never before pulled a gun on Cross, ordered Cross to the ground, or arrested Cross. Something different happened on June 17, 2016, and that was Keel saw Cross with a gun and knew Cross had been yelling, angry, and involved in a physical confrontation less than two hours earlier.

The Court also credits Keel's testimony that at the time he arrested Cross, Keel knew Cross was a felon. Keel and Cross grew up in the same community and attended the same grade school. In more recent years, Keel had seen Cross at the Crown Food Mart on a regular basis.[9] Keel testified that a few months prior to June 17, 2016, Timothy Cross' sister approached Keel while he was working his security job at the Mart and asked Keel if he had seen Timothy. Keel advised he had not seen Cross that night. According to Keel, Cross' sister then explained that she was concerned for her brother because she heard he'd been in a fight and gotten beaten up pretty bad, and he was a felon who had been incarcerated before and did not need to get in any trouble.

---

[9]     Although Cross was living in Belleville (not East St. Louis) at the time in question, Cross' mother lived two blocks from the Crown Food Mart, which explains the frequency of Cross' visits to the store.

The Court credits this testimony over that of Cross' well-meaning sister, Jessica, who testified that she never told Keel her brother was a felon or had done time in prison.[10] Jessica testified that although she no longer currently goes to the Crown Food Mart, previously (including in June of 2016), she would go there to look for her brother and make sure he "was okay" or not getting into trouble. That admission backs up Keel's testimony that he had a conversation with Cross' sister prior to the night of the arrest.

A convicted felon who knowingly possesses a firearm commits a federal offense. A person who knowingly carries on his person a weapon that is uncased, loaded, and immediately accessible, commits a state crime of aggravated unlawful use of weapon if certain other factors are met (*e.g.,* depending on whether the person has a FOID card or other permit, if he has been previously convicted of certain offenses or is currently engaged in the commission of certain offenses). ***See*** **720 ILCS 5/24-1.6.** Keel saw a person he knew to be a convicted felon with a silver revolver in his hand. Keel had probable cause to arrest Cross, and his search incident to that lawful arrest does not contravene the Fourth Amendment.

The undersigned credits Keel's sworn, in-court testimony that he saw a weapon in Cross' hands. But, even if Keel did not *see* the weapon in Cross' hands, Keel's actions

---

[10]     The police report Keel prepared and filed with the Washington Park Police Department the day of the arrest (June 17, 2016) states that Cross was arrested for UUW (unlawful use of weapon) "by a felon," buttressing Keel's testimony that, *at the time of the arrest* , Keel knew Cross to be a felon.

did not run afoul of the Constitution for another reason – he had an objectively reasonable *suspicion* that Cross was engaging in criminal activity plus an objectively reasonable *suspicion* that Cross was armed and dangerous.   Reasonable suspicion "requires more than a hunch but less than probable cause and considerably less than preponderance of the evidence."  *United States v. Mays,* **819 F.3d 951, 955 (7th Cir. 2016),** *citing Gentry v. Sevier,* **597 F.3d 838, 845 (7th Cir. 2010).**

*Terry v. Ohio*, **392 U.S. 1, 21-22 (1968),** authorizes a brief investigatory detention of an individual the police reasonably suspect, based on specific and articulable facts, of engaging in criminal activity. *United States v. Snow*, **656 F.3d 498, 500 (7th Cir. 2011),** *cert. denied*, **566 U.S. 941 (2012).**   In *United States v. Williams*, **731 F.3d 678, 695 (7th Cir. 2013),** the Court explained that in *Terry*, the Supreme Court:

> recognized "the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest." Thus, "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," he is permitted to take reasonable steps to assure the safety of himself and others. *Id.* This includes conducting "a reasonable search for weapons." *Id.* at 27….

The initial detention and the limited search present two different bars to clear.  In other words, once an officer has lawfully stopped a suspect, to conduct a protective search, the officer needs more.  He does not have to be *certain* the individual is armed, but he must have a reasonable suspicion that his (the officer's) safety or the safety of others is in danger.  Simply put, an officer conducting an investigatory stop may frisk a suspect for

weapons, "if the officer has an objectively reasonable suspicion that the suspect might be armed." *United States v. Ford*, **872 F.3d 412, 415 (7th Cir. 2017).** The quantum of proof needed to show reasonable suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. *United States v. Sokolow*, **490 U.S. 1, 7 (1989).**

In assessing whether an officer had reasonable suspicion of criminal activity, courts make a common-sense determination based on the totality of the circumstances known to the officer at the time of the stop, including the officer's experience and the suspect's characteristics and behavior. *Id; Mays*, **819 F.3d at 955.** Here, a reasonable police officer faced with the circumstances confronting Officer Keel, armed with Keel's knowledge, experience, and training, observing Cross' behavior throughout the night, would believe that "a crime may be afoot" (justifying Keel stopping Cross) and that Cross was armed and posed a danger to those in the immediate vicinity (justifying Keel's frisk of Cross). *See Green v. Newport*, **868 F.3d 629, 634-35 (7th Cir. 2017).**

It was just after midnight. *See, e.g., United States v. Patton*, **705 F.3d 734, 738 (7th Cir. 2013) (this is just one circumstance to consider to consider, but a night-time stop "is more fraught with potential danger" than a stop during the light of day).** The Crown Food Mart was known to be in an area where criminal activity occurs.[11] Timothy Cross had engaged in a physical fight with another person earlier in the

---

[11]    This factor, standing alone, does not give rise to a particularized suspicion, but "an officer is permitted to consider a location's characteristics when assessing a situation." *United States v. Oglesby*, **597 F.3d 891, 894 (7th Cir. 2010).**

evening, had been repeatedly ordered to leave the property, had lingered in complying with that command, had yelled several times to the other subject involved in the altercation, and had issued an arguably threatening declaration while leaving. He returned less than two hours later, and was seen by Keel immediately after a customer reported that a many in the parking lot had a gun. Other patrons and customers were in and around the lot, near Cross.

These factors, "filtered through an officer's training and experience," caused Keel to order Cross to raise his hands. *Mays*, **819 F.3d at 959.** *United States v. Oglesby*, **597 F.3d 891, 894 (7th Cir. 2010) ("Police officers are permitted to rely on their experience and training in forming a reasonable suspicion.").** After being told to raise his hands, Cross continued walking *away* from Officer Keel, around and behind the back of a car. This behavior could reasonably be perceived as evasion. *See Oglesby*, **597 F.3d at 894 (The Supreme Court has repeatedly recognized that nervous or evasive behavior is a "pertinent factor in determining reasonable suspicion.").** Other patrons were in close proximity to Timothy Cross as he walked away from Keel and around the Lincoln. Keel's suspicion that Cross was armed and presently dangerous was supported by specific, identifiable facts and was objectively reasonable. *See Patton*, **705 F.3d at 741.**

Keel lawfully detained Cross in the parking lot reasonably believing criminal activity was afoot, *and* Keel reasonably believed that Cross was armed and dangerous. Keel's search of Cross was supported by a reasonable suspicion that his safety and the

safety of other customers and patrons was in danger. Keel's actions survive constitutional scrutiny as a valid *Terry* stop and protective frisk.

### D. Conclusion

Assuming that security guard Lawrence Keel was acting as an agent of the government at the time he detained, arrested, and searched Timothy Cross, Keel's actions did not violate the Fourth Amendment. Keel had probable cause to arrest Cross, *see Gonzalez v. City of Elgin***, 578 F.3d 526, 537 (7th Cir. 2009) (probable cause exists at the time of an arrest if the facts and circumstances within the officer's knowledge would warrant a person of reasonable caution in believing that a suspect has committed, is committing, or is about to commit an offense),** and the search which followed was a permissible search-incident-to-lawful-arrest.

If Keel lacked probable cause, he had reasonable articulable suspicion that Cross was committing or about to commit an offense (allowing him to detain Cross) plus reasonable articulable suspicion that Cross was armed and dangerous (allowing him to frisk Cross for a weapon). *See, e.g., United States v. Leo***, 792 F.3d 742, 748 (7th Cir. 2015) (It is lawful for an officer, during an investigatory stop founded on reasonable suspicion that a crime is being, has been, or is about to be committed, to frisk a person for weapons, if the officer has articulable suspicion that that the person is both armed and a danger to the safety of officers or others.).**

Accordingly, the Court **DENIES** Defendant's suppression motion (Doc. 36/43). Trial remains set December 11, 2017.  It is scheduled "first out" of seven cases set that day, so the undersigned appreciates notice as soon as possible as to whether Defendant intends to proceed on that date as scheduled.  To be prepared in the event trial will be conducted December 11th, the Court **SETS a Final Pretrial Conference and Jury Instruction Conference for** <u>**1:00 p.m. on Wednesday, December 6, 2017.**</u>

Proposed jury instructions must be submitted in paper form in chambers (marked attn: Law Clerk Sheila Hunsicker; see detailed instructions on the undersigned's web-page as to formatting and organizing instructions) no later than <u>**1:00 p.m. on Thursday, November 30, 2017.**</u>   Directions regarding submission of witness lists and exhibit lists will follow separately.

IT IS SO ORDERED.

DATED November 22, 2017.

*s/ Michael J. Reagan*
Michael J. Reagan
United States District Judge
